IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL NO. 07-0375SOM |
| | ) | CRIM. NO. 03-0127SOM |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| ERNEST M. ESPARZA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN OPPOSITION TO ESPARZA'S 2255 PETITION**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**

**EXHIBIT "1"**


EDWARD H. KUBO, JR. 2499
United States Attorney

MICHAEL K. KAWAHARA 1460
Assistant U.S. Attorney
Room 6-100, Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Mike.Kawahara@usdoj.gov

Table of Contents

Page(s)

Table of Authorities . . . . . . . . . . . . . . . . . . . .  i

I.    OVERVIEW OF UNDERLYING CRIMINAL CASE AND
      RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . .  1

II.   EFFECT OF THE PLEA AGREEMENT ON THE CHARGES
      ESPARZA WAS FACING . . . . . . . . . . . . . . . . . . .  6

      (1) Drug trafficking crimes  . . . . . . . . . . . . . .  6

      (2) "Simple possession" drug crime . . . . . . . . . . .  7

      (3) "User in possession" firearms crime  . . . . . . . .  7

      (4) "Drug trafficking crime" firearms offenses . . . . .  7

III.  RELEVANT MATTERS BROUGHT UP AT SENTENCING  . . . . . . .  12

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Table of Authorities

Cases                                                                Page(s)

Doganiere v. United States,
     914 F.2d 165 (9th Cir. 1990) . . . . . . . . . . . . .  23

Strickland v. Washington,
     466 U.S. 668 (1984 . . . . . . . . . . . . . . . . . .  24

United States v. Booker,
     125 S.Ct. 738 (2005) . . . . . . . . . . . . . . . . .  5

United States v. Claiborne,
     870 F.2d 1463 (9th Cir. 1989) . . . . . . . . . . . .  24

Rules and Statutes

18 U.S.C. 2 . . . . . . . . . . . . . . . . . . . . . . . .  7

18 U.S.C. 3161 . . . . . . . . . . . . . . . . . . . . . .  22

18 U.S.C. 3553(a) . . . . . . . . . . . . . . . . . . 18, 27

18 U.S.C. 3553(e) . . . . . . . . . . . . . . . . . . . .  19

18 U.S.C. 921(a)(30) . . . . . . . . . . . . . . . . . . .  8

18 U.S.C. 922(g)(3) and 924(a)(2) . . . . . . . . . . . .  7

18 U.S.C. 924(c) . . . . . . . . . . . . . . . . . . . . .  6

18 U.S.C. 924(c)(1)(A)(i) . . . . . . . . . . . . . . 7, 8, 9

18 U.S.C. 924(c)(1)(B)(i) . . . . . . . . . . . . . . . 7, 8

18 U.S.C. 924(d)(ii) . . . . . . . . . . . . . . . . . . .  8

21 U.S.C. 844(a) . . . . . . . . . . . . . . . . . . . . .  7

21 U.S.C. 846, 841(a)(1) and 841(b)(1)(A) . . . . . . . . 7, 9

28 Moore's Federal Practice 672.03[3]
     (Matthew Bender 3d ed. 1997) . . . . . . . . . . . . .  23

28 U.S.C. 2255 . . . . . . . . . . . . . . . . . . . . . .  1

## MEMORANDUM IN OPPOSITION TO
## ESPARZA'S 2255 PETITION

The United States of America hereby opposes defendant Ernest M. Esparza's petition filed pursuant to 28 U.S.C. 2255.

I.  **OVERVIEW OF UNDERLYING CRIMINAL CASE AND RELEVANT FACTS:**

Esparza and his co-defendant Catarino Zavala Ojeda ("Ojeda") were charged in the Third Superseding Indictment with various methamphetamine trafficking and firearms offenses.  These charges related to a U.S.P.S. Express Mail parcel which had been sent from California and was addressed to "Ernesto Esparza" at the Hilo, Hawaii, residence where both Ojeda and he then resided. This parcel had originally contained about 2,635 grams (net weight) of 94% pure d-methamphetamine hydrochloride (a methamphetamine salt).  Within the parcel, the methamphetamine had been concealed within two (2), one gallon-size metal cans, which had been cut in half and then soldered back together, resulting in horizontal, soldered seams around both cans' circumferences.  PSR6.

On March 7, 2003, law enforcement officers effected a controlled delivery of this parcel (with a pseudo-methamphetamine substance substituted for the real drugs) to the designated recipient address.  Esparza himself accepted delivery of this parcel and took it into the residence.  Later on the night of March 7 - 8, 2003, both Esparza and Ojeda were arrested and the parcel recovered from Ojeda's vehicle.  PSR6-7.

At the time of Esparza's arrest, a Makarov semi-automatic pistol (loaded with a magazine containing eight rounds), was found concealed under the driver's floormat of the vehicle that he (Esparza) was driving. PSR7.[1]  Ojeda was similarly armed, having a Ruger semi-automatic pistol (loaded with twelve rounds in a magazine) in his own automobile.  PSR7.

Esparza's leather jacket, also found in his vehicle, contained approximately 11.2 grams (net weight) of cocaine. PSR7.

After Esparza and Ojeda were arrested, their residence was searched.  In addition to the foregoing firearms, a folding stock, AK-47 assault rifle, with a loaded magazine inserted (as well three additional loaded magazines of ammunition, for a total of 115 rounds), was found in one of the residence's bedrooms. PSR7-8, ER131.  Esparza was directly associated with this assault rifle, because two photographs of him carrying this same type of weapon were also found in his vehicle.  PSR7.

There were also two, empty one gallon-size metal cans found in the residence, which had been cut in half and whose appearance was similar to the cans used to conceal the methamphetamine in the Express Mail parcel.  There was also a soldering iron and

---

[1] In addition, Esparza also had another loaded magazine (8 rounds) and a cartridge box containing an additional 23 rounds for this Makarov pistol elsewhere in his vehicle. PSR7.

2

solder present in the residence (i.e., to re-seal the cans back together).   PSR7-8.

A sealed coffee can was also found in the residence's kitchen that bore a similar soldered seam around its circumference.   This coffee can contained $25,030 in cash. Furthermore, an additional $11,000 in cash was found in Esparza's master bedroom area.   PSR6-7.   It consequently appeared that the instant Express Mail shipment of methamphetamine was a routine replenishment of Esparza and Ojeda's drug inventory, and that both their mainland drug supplier and the two defendants used the same "can" m.o. to conceal the drugs and drug purchase money. Moreover, it was also evident that Esparza and Ojeda had already sealed the first installment of drug purchase money in the coffee can for imminent shipment back to their mainland supplier, with the additional $11,000 in Esparza's bedroom being readied for a follow-up shipment.

Trial in the instant case for both defendants was supposed to commence on June 16, 2004.   However, on June 14-- two days prior to trial-- both Esparza and Ojeda pled guilty pursuant to separate, but similar, plea agreements to an Information with reduced firearms charges asserted against them.   The plea agreements for both defendants afforded substantial sentencing benefits; because one of the more serious firearms offenses was eliminated, the statutory minimum was reduced from 240 months

3

(twenty years) to 180 months (fifteen years) and the applicable
Guideline sentencing ranges were also reduced.  Both plea
agreements also required that the defendants waive their right to
appeal their sentences.

Additionally, contrary to Esparza's allegations, even though
the Information only referenced the requisite "50 grams or more"
of methamphetamine so as to trigger the enhanced statutory ten
year - life imprisonment sentence for Count 1, there was never
any question as to the applicable drug quantity/quality involved
in this case.  Both defendants had previously received the
relevant laboratory test reports and had already entered into a
written Trial Stipulation (filed on May 20, 2004, nearly one
month prior to the scheduled trial date) as to the laboratory
testing and findings for all of the drug evidence recovered in
this case.[2]  Furthermore, Esparza's plea agreement expressly

---

[2] With respect to the methamphetamine in the Express Mail
parcel (and the subject of Count 1 of the Information), this
Trial Stipulation had provided as follows:

    The prosecution and the defendants hereby stipulate to
    the following facts.  This means that the jury should
    consider the following facts as proven.

    The DEA Southwest Laboratory in Vista, CA, previously
    received Exhibits 108, 211a, 211b, and 806d.  The Laboratory
    thereafter conducted chemical analysis of the substances
    contained in these Exhibits.  After completing such testing,
    the Laboratory determined as follows:

        Exhibit 108 [from the Express Mail parcel]: the
    crystalline substance contained in this exhibit was d-
                                            (continued...)

4

referenced this Trial Stipulation and provided that the
methamphetamine quantity specified therein was the amount
contained in the subject parcel and involved in Count 1 of the
Information for Guideline sentencing purposes.  See plea
agreement, para. 12(a)(1) at 8-9.

Esparza's sentencing occurred on May 20, 2005, subsequent to
the Supreme Court's ruling in United States v. Booker, 125 S.Ct.
738 (2005), that the U.S. Sentencing Commission Guidelines were
advisory only and no longer mandatory.  The District Court
sentenced Esparza to 228 months imprisonment (19 years), broken
down as follows:

---

[2](...continued)
Methamphetamine Hydrochloride, with a net weight of 2,635
grams and a purity by weight of 94%.  The 'net weight' is
the weight of a substance by itself and not including its
exterior wrappings and containers.  The amount of pure d-
Methamphetamine Hydrochloride is mathematically calculated
by multiplying the net weight by the purity.  In this
exhibit, the amount of pure Methamphetamine Hydrochloride is
2,477 grams.

\* \* \*

D-Methamphetamine Hydrochloride is the salt form of
methamphetamine and is a Schedule II controlled substance.

[emphasis added].

As indicated in the presentence investigation, Esparza's Base
Offense Level was calculated from this particular drug exhibit.
PSR10.

-<u>Count 1 of the Information</u> (conspiracy to
    to distribute/possess with intent to
    distribute 50+ grams of methamphetamine:   168 months[3]

-<u>Count 4 of the Information</u> (use/carriage of
    of firearm during/in relation to the drug
    trafficking crime alleged in Count 1):     60 months

                              TOTAL:        228 months[4]

In other words, in exercising its discretion under <u>Booker</u>, this
Court elected to sentence Esparza to the low end of his advisory
Guideline sentencing range on Count 1.

Esparza thereafter appealed his sentence.  In an unpublished
memorandum decision filed April 11, 2006 in C.A. No. 05-10419,
the Ninth Circuit Court of Appeals rejected Esparza's contentions
and dismissed the appeal pursuant to appellate waiver provision
contained in the plea agreement.

II.  **EFFECT OF THE PLEA AGREEMENT ON THE CHARGES ESPARZA WAS
FACING:**

Had this case proceeded to trial as scheduled on June 16,
2004, Esparza would have faced the following charges alleged in
the Third Superseding Indictment:

(1) **<u>Drug trafficking crimes</u>:**

<u>Count 1</u>: up through and including on or about March 7,
2003, conspiring with co-defendant Ojeda to distribute/possess

---

[3] Esparza's advisory Guideline sentencing range for Count 1
was 168 - 210 months, based upon TOL 35, Criminal History
Category I. PSR14.

[4] Pursuant to 18 U.S.C. 924(c), the five year (60 month)
imprisonment sentence for the firearm use/carriage crime had to
be consecutive to the drug trafficking crime.

with intent to distribute fifty (50) grams of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. 846, 841(a)(1) and 841(b)(1)(A).

       -<u>Statutory penalty</u>: 10 years - life imprisonment.

       <u>Count 2</u>: on or about March 7, 2003, attempting to possess with intent to distribute fifty (50) grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. 846, 841(a)(1), and 841(b)(1)(A), and 18 U.S.C. 2.

       -<u>Statutory penalty</u>: 10 years - life imprisonment.

    (2) **"<u>Simple possession</u>" <u>drug crime</u>**:

       <u>Count 5</u>: on or about March 7, 2003, possessing a quantity of cocaine, in violation of 21 U.S.C. 844(a).

       -<u>Statutory penalty</u>: up to 1 year imprisonment.

    (3) **"<u>User in possession</u>" <u>firearms crime</u>**:

       <u>Count 3</u>: on or about March 7, 2003, possessing a Makarov semi-automatic pistol ("Makarov pistol") and a Model AKM-47S semi-automatic assault rifle ("AK-47 rifle") and ammunition therefor, while being an unlawful user of cocaine, a Schedule II narcotic controlled substance, in violation of 18 U.S.C. 922(g)(3) and 924(a)(2).

       -<u>Statutory penalty</u>: up to 10 years imprisonment.

    (4) **"<u>Drug trafficking crime</u>" <u>firearms offenses</u>**:

       <u>Count 7</u>: on or about March 7, 2003, carrying a Ruger Model 85 semi-automatic pistol (hereinafter "Ruger pistol") during and in relation to the drug trafficking crime alleged in Counts 1 and 2, in violation of 18 U.S.C. 924(c)(1)(A)(i).

       -<u>Statutory penalty</u>: 5 years imprisonment, consecutive to the sentences imposed for the charged drug trafficking crimes.

       <u>Count 8</u>: on or about March 7, 2003, possessing the AK-47 rifle in furtherance of the drug trafficking crime alleged in Counts 1 and 2, in violation of 18 U.S.C. 924(c)(1)(B)(i).

-<u>Statutory penalty</u>: 10 years imprisonment, consecutive to the sentences imposed for the charged drug trafficking crimes.[5]

<u>Count 9</u>: on or about March 7, 2003, possessing the Makarov pistol in furtherance of the drug trafficking crime alleged in Counts 1 and 2, in violation of 18 U.S.C. 924(c)(1)(A)(i).

-<u>Statutory penalty</u>: 5 years imprisonment, consecutive to the sentences imposed for the charged drug trafficking crimes.

As indicated earlier, both defendants elected to plead guilty on the eve of trial. Pursuant to Esparza's written plea agreement, the Third Superseding Indictment was dismissed. In its stead, Esparza pled guilty to the newly-filed Information, which contained the following charges against him:

<u>Information, Count 1</u>:[6] from a time unknown up through and including March 8, 2003, conspiring with co-defendant Ojeda

---

[5] Up through September 13, 2004, 18 U.S.C. 924(c)(1)(B)(i) provided that:

[i]f the firearm possessed by a person convicted of a violation of this subsection--

(i) is a short-barreled rifle, short-barreled shotgun, or <u>semiautomatic assault weapon</u>, the person shall be sentenced to a term of imprisonment of not less than 10 years . . . .

[emphasis added].

The AK-47 assault rifle in this case fell within the definition of a "semiautomatic assault weapon". 18 U.S.C. 921(a)(30).

Pursuant to 18 U.S.C. 924(d)(ii), this was to be a consecutive sentence.

[6] This same charge was previously asserted in Count 1 of the Third Superseding Indictment.

8

to distribute/possess with intent to distribute fifty (50) grams of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. 846, 841(a)(1) and 841(b)(1)(A).

    -<u>Statutory penalty</u>: 10 years - life imprisonment.

    <u>Information, Count 4</u>:[7] on or about March 7, 2003, possessing the Makarov pistol in furtherance of the drug trafficking crime alleged in Count 1 of the Information, in violation of 18 U.S.C. 924 924(c)(1)(A)(i).

    -<u>Statutory penalty</u>: 5 years imprisonment, consecutive to the sentences imposed for the charged drug trafficking crimes.

    <u>Information, Count 5</u>:[8] on or about March 7, 2003, possessing the AK-47 rifle and ammunition therefor, while being an unlawful user of cocaine, a Schedule II narcotic controlled substance, in violation of 18 U.S.C. 922(g)(3) and 924(a)(2).

    -<u>Statutory penalty</u>: up to 10 years imprisonment.

The factual basis for Esparza's guilty pleas to these three Information Counts was set forth in his plea agreement, as follows:

    10. [Esparza] admits the following facts and agrees that they are not a detailed recitation, but merely an outline of what happened in relation to the charges to which Defendant is pleading guilty:

        a.  On and prior to March 7, 2003, both Ojeda and Esparza resided at 194 Kuleana Loop, Hilo, HI.

        b.  On or about March 3, 2003, a U.S. Express Mail parcel was presented to the U.S. Postal Service in California for delivery to "Ernesto Esparza, 194 Kuleana Loop, Hilo, HI" (hereinafter "subject parcel").  The subject

---

    [7] This same charge was previously asserted in Count 9 of the Third Superseding Indictment.

    [8] This same charge was previously asserted against Esparza in Count 3 of the Third Superseding Indictment.

parcel contained the methamphetamine described in greater detail in paragraph 12(a)(1) of this Agreement.

c.   Both Ojeda and Esparza knew that the subject parcel contained methamphetamine, and they were expecting the parcel's delivery to their residence.  After receiving this parcel, Ojeda and Esparza were planning to jointly distribute the methamphetamine to other persons in Hawaii.

d.   At the time of his arrest on March 7, 2003, Esparza was carrying the Makarov pistol in the Isuzu Rodeo vehicle he was then driving.  Esparza was possessing this pistol in order to protect the methamphetamine that Ojeda and he were distributing and the money which they received from sales of the methamphetamine.

e.   At the time of his arrest on March 7, 2003, Esparza also possessed in his leather jacket a small amount of cocaine, which was for his personal use.  At all relevant times herein, Esparza was an unlawful user of cocaine.

f.   In addition, on or about March 7, 2003, the AK-47 assault rifle was kept in one of the bedrooms at 194 Kuleana Loop.  Both Ojeda and Esparza jointly controlled and possessed this AK-47 assault rifle.

Both defendants' plea agreements were similar.  The most significant provision therein was the dismissal of Count 8 of the Third Superseding Indictment against both defendants.  This had the effect of reducing the statutorily-mandated consecutive sentence for the firearms violations from ten years down to five years.  Under the plea agreement, Esparza's statutory minimum sentence was now fifteen years (180 months).[9]  Because of the

---

[9] If he had been convicted of the Third Superseding Indictment, Esparza's statutory minimum sentence would have been 240 months (20 years), that is to say, the ten year minimum for the methamphetamine trafficking crimes in Counts 1 and/or 2, and a ten year consecutive term for the AK-47 assault rifle possession under Count 8.

(continued...)

significant sentencing leniency afforded, the prosecution

declined to offer the plea agreement to each defendant

separately, but rather conditioned its effectiveness upon both

defendants simultaneously accepting it.

As the prosecution also pointed out in its Sentencing

Statement filed August 18, 2004:

> We will explain our views of Esparza and Ojeda's differing
> levels of 'acceptance of responsibility'. Esparza, through
> his counsel, had indicated a willingness to plead guilty to
> the charges set forth in the Information for at least one
> month prior to the trial date. However, the prosecution's
> proposed plea resolution was conditioned upon both
> defendants' pleading guilty to the charges, and in the
> absence of Ojeda's simultaneous concurrence at that time, no
> plea by either defendant was entered. The bottom line is
> that the United States' subsequent trial preparation was
> engendered not by Esparza, but rather Ojeda's desire to have
> a trial. Consequently, when Ojeda ultimately elected to
> plead guilty to the Information, the prosecution was willing
> to entertain a two-level, 'acceptance of responsibility'
> reduction for both defendants; however, in our view, only
> Esparza was further entitled to the third point.

Because Ojeda was ineligible for the third point for "acceptance

of responsibility", the low end of his Guideline range was 188

months, or twenty months more than Esparza's.[10]  This Court later

---

[9](...continued)
    Under the plea agreement, Esparza was only facing a five
year consecutive sentence for the firearms offense in Count 4 of
the Information (with respect to Esparza's Makarov pistol).


[10] Ojeda's Total Offense Level was "36", Criminal History
Category I, with an advisory Guideline range of 188 - 235 months.

    Contrary to Esparza's assertions in his 2255 petition,
Ojeda's criminal history category was the same as Esparza's.  The
                                                        (continued...)

sentenced Ojeda on November 17, 2005 to 248 months (188 + 60 months). In other words, this Court actually sentenced Ojeda more severely than Esparza.

## III. **RELEVANT MATTERS BROUGHT UP AT SENTENCING:**

Given the relatively egregious and aggravating facts present in this case, Esparza's trial counsel, Arthur Ross, Esq., was in the very unenviable position of attempting to construct arguments for sentencing leniency without having any credible evidentiary basis to support them. Consequently, when Esparza claimed in his supporting memorandum at 1 that "[a]t sentencing, Counsel was unprepared", and "Counsel argued factors having no relevance to allegations made", the reality was that it was not really possible to make credible sentencing arguments on Esparza's, through no fault of Mr. Ross.

In its Sentencing Memorandum filed March 17, 2005, the United States had the luxury of being able to forcefully contend that:

> The evidence found in their residence showed a regular
> course-of-conduct of receiving the drugs from the mainland
> and sending back money in payment therefor [the drugs and
> money being concealed in similarly-modified metal cans]. In
> other words, the clear inference was that both defendants
> had been engaged in methamphetamine trafficking over a
> period of time and that the instant shipment was merely the
> routine replenishment of their drug inventory.

---

[10](...continued)
difference between the pair's Total Offense Levels was Esparza's
eligibility for the third point for "acceptance of
responsibility", as described above.

* * *

[I]t readily appears that both Esparza and Ojeda had co-equal access and control over the money, and that tells a lot about their respective roles in this methamphetamine trafficking operation: they were equal partners in this venture.

Other evidence indicates that Esparza and Ojeda's respective criminal roles were relatively equivalent. Both defendants were heavily armed. Each carried a loaded semi-automatic pistol, which was concealed in their respective vehicles. Given that a magazine and ammunition corresponding to the pistols that Esparza and Ojeda carried were also found in their respective bedrooms, it was also abundantly clear that they maintained said weapons in their immediate possession at all times.

That was not all: they also jointly possessed a loaded semi-automatic rifle with four magazines containing 115 rounds of ammunition inside their residence (including one chambered round). Ojeda obviously had direct access to this fearsome weapon, in that it was located in his bedroom directly beneath his bed. However, from the two Polaroid photographs depicting Esparza carrying this assault rifle (not to mention the pistol in his waistband in these photographs), it is also clear that Esparza had equal access to this rifle, too, and wanted to 'show off' by having such 'souvenir' photographs.

During the sentencing hearing itself, the United States also contended that the two defendants had "turned their house into a fortress" in the middle of an unsuspecting residential neighborhood for the purpose of protecting their drug inventory and money. T.P.(5/20/05) at 10, 38-9. Furthermore, to counter Esparza's claim that "nobody got hurt in this case", see T.P. (5/20/05) at 35, the prosecution also pointed out that "the reason these defendants had been taken down without harm, without violence either to themselves, the arresting officers, or the

13

neighborhood, is because of the professionalism of the . . .

United States Postal Inspection Service, the DEA, and the Hawaii

County Police Department [and] is not the result of anything that

these defendants did on their own". T.P.(5/20/05) at 39.

Mr. Ross himself expressly recognized the extreme difficulty

of his task at sentencing in his subsequently-filed Declaration,

wherein he indicated in paragraph 29(a) thereof that:

> To put it succinctly, Esparza got an additional four (48)
> months above the statutory mandatory minimum he contests
> here because he posed for a photograph 'showing off' with
> guns.  This caused the government to believe Esparza was
> more involved with weapons than the rest of the evidence
> otherwise showed.

Additionally, contrary to Esparza's allegations in his 2255

petition, Mr. Ross had in fact argued during the sentencing

hearing that "I would ask the Court to give him some downward

credit for not having been arrested before" (T.P.(5/20/05) at

40).  In any event, the Court was fully aware from the

presentence report that this was Esparza's first conviction,[11]

and in explaining the sentence it adjudged for Esparza, this

Court expressly said "I did consult the guidelines looking at the

type and amount of methamphetamine, looking at his possession of

a firearm, his acceptance of responsibility and the absence of

---

[11] The presentence report indicated that Esparza had no
known juvenile adjudications or adult criminal convictions
(PSR12) and as a result thereof, the Court expressly found that
his Criminal History category was "I" (the lowest available under
the Guidelines).  T.P. (5/20/05) at 26.

<u>earlier convictions</u>".  T.P.(5/20/05) at 44 [emphasis added].
Moreover, in his attempt to self-servingly enhance himself at
Ojeda's expense, Esparza incorrectly implied in his 2255 petition
that the former had a prior criminal record.  As hereinbefore
indicated, both Esparza and Ojeda's prior criminal histories were
the same under the Guidelines, that is, the lowest possible of
Criminal History Category I.  That Esparza did not have any prior
convictions was likely a reason why this Court decided to
sentence him at the low end of the Guideline range rather than
the high end.

In addition, this Court's Probation Office had independently
conducted a study of defendant's personal history, which was
documented in the presentence report and was readily available
for the Court's consideration.  <u>See</u> PSR12-4.  As a result of this
information, the Court was knowledgeable about potentially
mitigating factors such Esparza's "very long history of untreated
drug abuse", and his "stable employment history", <u>see</u>
T.P.(5/20/05) at 44, and consequently was able to fashion
sentencing recommendations to affirmatively assist in Esparza's
rehabilitation, such as the 500 hour drug treatment program and
education/vocational programs.  T.P.(5/20/05) at 45-6.  Esparza's
2255 petition does not claim that this personal history

recitation was incorrect nor prejudiced him in any way.[12]  Nor

does Esparza indicate what other information about him would have

make a significant difference at his sentencing.

In his Sentencing Statement filed August 31, 2004, Mr. Ross

elected to contend, among other things, that Esparza was eligible

for "minor participant" status under Guideline 3B1.2, that a

departure should be authorized because he lacked knowledge of the

methamphetamine's purity, and that he should be eligible for a

downward departure motion by the prosecution for his substantial

assistance.

In promulgating his "minor participant" argument, Mr. Ross

in part relied upon a letter (in Spanish) which Esparza

supposedly received from co-defendant Ojeda while they were

incarcerated at FDC-Honolulu.  Mr. Ross provided a copy of this

letter to the Court at the sentencing hearing.  T.P.(5/20/05) at

5.  Any significance to be attached to this letter was solely

based upon Esparza's own uncorroborated assertions, inasmuch as

it was he who produced the letter in the first instance.[13]  Mr.

---

[12] Furthermore, contrary to Esparza's allegations, Mr. Ross
did make an effort to look into his background history for
potentially mitigatory information.  As Mr. Ross indicated in his
Declaration in paragraph 29(e), "[n]or did Esparza tell me of
anything in his childhood background which would have been
helpful or relevant to sentencing".

[13] As indicated in the prosecution's transmittal memo to Mr.
Ross dated May 17, 2005:

(continued...)

16

[13](...continued)

As requested today, please find attached a copy of the
Spanish handwritten letter which was received from Alvin
Nishimura, your predecessor defense counsel.  I also include
an English translation thereof, which was accomplished by
one of the HIDTA interpreters.

Please note that it has been impossible to determine who
authored this letter.  When interviewed about this letter by
Postal Inspector Cynthia Blank on May 14, 2003, Esparza
claimed the handwriting was that of co-defendant Jose Manuel
Amarillas Ojeda.  However, there is no independent proof
establishing this.  In addition, Esparza also advised that
the letter was originally contained in an envelope which
said "To Ernesto, From Jose", but that he (Esparza) threw
the envelope away.

Attached Exhibit "1" at 1.

During the sentencing hearing, government counsel further advised
the Court that:

MR. KAWAHARA: Your Honor, with respect to this letter, which
happened was that I got a call from Mr. Esparza's prior
counsel, indicating he had received this letter which Mr.
Esparza supposedly attributed to his codefendant.

A meeting was thereafter set up, and it was Mr.- the prior
counsel's, my recollection was Mr. Nishimura who had the
letter, who gave it to Postal Inspector Cindy Blank and
sometime in May there was an interview at FDC between Mr.
Esparza, Mr. Nishimura, and Cindy Blank concerning this
particular memo.  You'll note that-

THE COURT: There's no signature, right?

MR. KAWAHARA: - That's correct.  And there's no mention of
any names in the letter itself.  Supposedly- the only
possible connection to the codefendant was supposedly the
envelope in which this letter was contained that was address
to Ernesto from Jose.  Jose, of course, being the name of-
the real name of the codefendant.  Unfortunately, Mr.
Esparza threw away the envelope.  That's what he told Cindy
Blank at that time.

(continued...)

17

Ross contended at sentencing that because Ojeda (the supposed author of this letter) asked Esparza to take the "rap" for him, this showed that Esparza was the minor participant vis a vis his co-defendant. However, the Court found this argument logically untenable and rejected it. T.P.(5/20/05) at 7-8. Instead, the Court accepted the Probation Office's recommendation that Esparza was not eligible for "minor participant" status and held that his Total Offense Level in the absence of this adjustment was "35", Criminal History Category I. T.P.(5/20/05) at 26, 41.

In addition, while the Court rejected his downward departure request based upon drug purity (T.P.(5/20/05) at 40-1), it also expressly recognized its full discretion to sentence Esparza down to the statutory minimum of 180 months, based upon the sentencing factors articulated in 18 U.S.C. 3553(a).[14] Mr. Ross himself argued that the appropriate sentence for Esparza was the statutory minimum. T.P.(5/2/05) at 30-5, 40-2.

---

[13](...continued)
T.P.(5/20/05) at 8-9.

The prosecution proceeded to detail why forensic handwriting analysis in this instance was not practical, and more importantly, "there were some serious credibility issues with this defendant and explains why we never used him or wanted to use him as a cooperating defendant in this case". T.P.(5/20/05) at 10.

[14] As indicated earlier, this was based upon the statutory minimum of 120 months (10 years) for the drug offense, and the statutory consecutive 60 month (5 year) sentence for the firearms offense.

The filing of any departure motion on Esparza's behalf was solely within the discretion of the United States under 18 U.S.C. 3553(e) and Guideline 5K1.1 and consequently, was entirely outside of Mr. Ross' ability to control or effect.[15] As Mr. Ross said in his Declaration in paragraph 29(f):

> Esparza couldn't get a 5K downward departure motion because the government wouldn't make the appropriate motion. I argued strenuously that Esparza was much less culpable that Ojeda and should not be sentenced to more tha[n] [sic] the mandatory minimum; the court disagreed.

Lastly, at one point during his sentencing argument, Mr. Ross inadvertently overstated his case by saying "we were sort of coerced into signing this [plea] agreement . . . .", see T.P.(5/20/05) at 16), which caused this Court to call for a recess such that Mr. Ross and Esparza could consult about withdrawing his guilty plea. T.P.(5/20/05) at 19. When the

---

[15] The United States explained to the Court as follows during the sentencing hearing:

> Mr. Esparza talks about providing information on these other persons. Well, first of all, if Mr. Esparza could not provide us with complete and truthful information with respect to himself, it raised questions about his credibility and what kind of cooperation value he may have to assist on the others.

T.P.(5/20/05) at 37.

-and-

> [t]here were some serious credibility issues with this defendant and explains why we never used him or wanted to use him as a cooperating defendant in this case.

T.P.(5/20/05) at 10.

19

sentencing hearing recommenced, the following colloquy occurred

between Mr. Ross and the Court:

> MR. ROSS: The defendant's position is after rereading the
> transcript of what was said at the plea agreement, the
> taking of the plea that he'll stick with that.
>
> THE COURT: It's true?
>
> MR. ROSS: Yes.
>
> THE COURT: Okay.
>
> MR. ROSS: He didn't make any statements.  I, I used the word
> coercion ill- ill advisedly.
>
> THE COURT: Okay.
>
> MR. ROSS: That's my word, not his.
>
> T.P.(5/20/05) at 19-20.

In other words, contrary to Esparza's 2255 petition, there was

never a situation in which "Counsel nearly obtained a perjury

charge for his client by contending that the statements made by

Petitioner were not true under oath". Supporting memorandum at 8-

9.  If anything, Mr. Ross accentuated Esparza's acceptance of

responsibility by re-validating his continuing concurrence in the

plea agreement.

### ARGUMENT:

Esparza's 2255 petition did not contest his plea agreement

and guilty plea, nor did he claim that any ineffective assistance

of defense counsel was associated therewith.  Rather, his primary

contention was that Mr. Ross' alleged ineffectiveness occurred at

the sentencing hearing, which supposedly caused to him to be

wrongfully sentenced to 228 months, well-above the statutory minimum of 180 months (15 years).[16]

In order to maintain the proper perspective in assessing Mr. Ross' overall legal representation of Esparza herein, it should not be forgotten that the sentencing benefits of this plea agreement- which Esparza does not contest in any way- were the result of Mr. Ross' efforts in the first instance.  Given Ojeda's eleventh hour change-of-mind, the prosecution had no obligation whatsoever to allow the plea agreement to go forward for both defendants at that time and could very well have left the matter to be resolved at trial.  It was only due to Mr. Ross' efforts that the prosecution was persuaded that reviving the plea agreement for both defendants was an appropriate disposition of the case.  Consequently, that Esparza:

> (1) had the opportunity to seek a lesser punishment under the Information and plea agreement, and
>
> (2) actually received a sentence (228 months, or 19 years) which was less than the statutory 20 year minimum he otherwise would have faced if convicted at trial of the charges enumerated in the Third Superseding Indictment,

---

[16] Esparza stated in his supporting memorandum at 1 that "[o]n May 20, 2005, Petitioner was brought into sentencing before Honorable Susan Oki Mollway, and is the basis [sic] of this complaint" [emphasis added].

Consistent therewith, Esparza further stated in his supporting memorandum at 7 that "[t]hus, the sentence must be vacated and Petitioner resentenced to a term of 10 years on Counts 1 and 5, and 60 months on Count 4, for a sentence of 180 months total, not the 228 months currently imposed".

were entirely due to Mr. Ross' able representation efforts.

In this connection, Esparza's contentions in his supporting memorandum at 8-9 that Mr. Ross was ineffective by not seeking to dismiss the indictment for, and/or otherwise appeal, alleged violations of the Speedy Trial Act, 18 U.S.C. 3161, and because the amount of methamphetamine contained in the subject parcel was not specifically alleged, smack of attempting to "have one's cake and eat it, too". Such objections were waived by the voluntary entry of his unconditional guilty pleas pursuant to the plea agreement, which Esparza affirmatively sought in order to obtain the sentencing benefits previously enumerated. In any event, there was no substantive Speedy Trial Act violation herein, because all of the accountable time was appropriately excluded by orders of this Court, taking into account that an original indictment and then three additional superseding indictments were subsequently returned during the period March 10, 2003 - December 17, 2003, and Esparza changed his appointed counsel.[17] By like token, there is no legal authority (and Esparza himself has not cited any) which would require the charging document (indictment

_____

[17] Contrary to Esparza's suggestion in his supporting memorandum at 9, there was no three year delay in this case. The Speedy Trial Act, by its own terms, only covered the period between arrest, formal initiation of the criminal case, and the convening of the trial; the Act did not apply to sentencing delay. Herein, defendants had been arrested on March 8, 2003, the initial indictment was returned on March 19, 2003, and Esparza ultimately pled guilty on June 14, 2004, thus obviating the need for a trial.

22

or information) to allege the total amount of the particular drug involved in the case above and beyond the minimum threshold identified in the applicable statute to trigger an enhanced maximum sentence.

Furthermore, that this Court was not persuaded that the minimum 180 month imprisonment term was an appropriate sentence herein was not due to any failing by Mr. Ross, but rather, that the available evidence showed a higher degree of criminal culpability and aggravation on Esparza's part which could only be adequately addressed by a sentence within the Guideline range, albeit at the lower end.  Given the large amount of methamphetamine and drug money involved in just this one shipment and that both defendants were heavily armed, it is difficult to come to any other reasonable conclusion.

It is hornbook law that "[i]f the allegations made in the [2255] motion are conclusively refuted by the record, then summary dismissal is appropriate. 28 Moore's Federal Practice 672.03[3] (Matthew Bender 3d ed. 1997).  Accord, Doganiere v. United States, 914 F.2d 165, 168 (9th Cir. 1990).  We submit that the record herein, as supplemented by Mr. Ross' Declaration[18], entirely refutes Esparza's allegations of ineffective assistance

---

[18] The Ross Declaration is appended to the United States' "Motion for Expansion of Record Pursuant to Rule7, Rules Governing Section 2255 Proceedings for the United States District Courts", filed October 19, 2007.

23

of counsel by Mr. Ross at the sentencing hearing and consequently, his petition should be dismissed without the need of an evidentiary hearing.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-prong test to evaluate ineffective assistance of defense counsel claims.  The defendant must prove: first, that his counsel's performance fell below an objective standard of reasonableness, and second, that counsel's deficient performance actually prejudiced the defendant.

Under the first prong, there is a "strong presumption" that defense counsel's strategy and tactics fell "within the wide range of reasonable professional assistance".  Strickland, 466 U.S. at 689.  The Ninth Circuit has further clarified this to mean that ". . . a reviewing court is not free to engage in after-the-fact second guessing of strategic decisions made by defense counsel.  Instead, judicial scrutiny of 'counsel's performance must be highly deferential' [quoting from Strickland]".  United States v. Claiborne, 870 F.2d 1463, 1468 (9th Cir. 1989).

With respect to the second prong of prejudice, the Supreme Court in Strickland further stated that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different".  466 U.S. at 694.

Herein, we have already addressed a number of Esparza's specific allegations of ineffective assistance of counsel and for the reasons set forth earlier, we believe them to be without merit. Esparza's remaining contentions are equally meritless because: (1) they fall within that broad range of "reasonable professional assistance", for which judicial review thereof must be "highly deferential"; or (2) Esparza has failed to establish how he was prejudiced by the alleged conduct. We address each remaining contention below.

"<u>Counsel failed to keep Petitioner apprised of all matters</u> <u>and inform him to be able to understand what he was acting upon</u>": This is a highly speculative allegation without any factual support therefor nor any showing or explanation as to how this specifically prejudiced Esparza in this case. In any event, the record in this case shows to the contrary. All of the information and factors relied-upon in this case to sentence Esparza were contained in the presentence report. At the very beginning of the sentencing hearing, this Court asked Esparza whether he had the opportunity: (i) to review the presentence report, and (ii) to have his attorney state all of Esparza's objections to the matters contained in the report; Esparza answered in the affirmative to both queries. T.P.(5/20/05) at 2. Therefore, it is difficult to understand how Esparza at this late date could credibly contend that Mr. Ross did not keep him

apprised of the relevant matters pertaining to his sentencing, when his responses in open court would indicate to the contrary.

"Counsel failed to investigate both the law and facts as it related to Petitioner's offense and sentence": Like the prior allegation, the instant averment has no specificity as to what was not investigated nor any explanation as to how that would have prejudiced him.

"Attempting to argue a minor role, without any supporting factors for the court to consider, except a letter [presumably attached Exhibit "1"] that was never authenticated for validity": Contrary to Esparza's complaint, the "minor participant" Guideline contention allowed Mr. Ross the opportunity to highlight and to attempt to draw distinctions between the respective roles of Esparza and Ojeda, further arguing (albeit unsuccessfully) that the former had a lesser role than the latter in the conspiracy. See Esparza's Sentencing Statement, filed August 31, 2004, at 5-9.[19] As Mr. Ross further contended during

---

[19] As Mr. Ross argued in the Sentencing Statement at 7-8:

There is no evidence suggesting that Esparza was any more than a minor participant in the conspiracy to distribute 'ice'. He did not arrange any part of the importation or distribution process nor has Ojeda suggested that he was any more than a courier/receiver for his enterprise. Esparza was not the one who dealt with the suppliers and distributed the drugs after arrival. [citation omitted] Esparza admitted his awareness of Ojeda's drug activities, which ties him tot he conspiracy, but he disclaims being involved in Ojeda's drug dealings, decision making, purchasing drugs,

(continued...)

the sentencing hearing:

> What I was really trying to tell you about this letter
> [attached Exhibit "1"] is that when dealing with the
> Probation Office and responding to their statements that Mr.
> Esparza didn't have an aggravating role in this case, they
> indicated they thought he was an equal player.  And I'm
> trying to show that he's not an equal player.  He was the
> underling in this case, the courier.  Not one of the people
> that benefitted.

> T.P.(5/20/05) at 13.

Even though Mr. Ross did not prevail on the discrete "minor

participant" Guideline issue, this as a strategic matter set the

stage for his subsequent arguments concerning the Court's

discretionary application of the 18 U.S.C. 3553(a) factors, and

it was in this latter aspect of sentencing in which Mr. Ross was

more successful.  As hereinbefore indicated, Mr. Ross'

contentions and sentencing strategy appeared to have convinced

the Court that Esparza's criminal involvement was deserving of an

imprisonment sentence some twenty months less severe than that

imposed on Ojeda.  Therefore, it cannot be said that Mr. Ross'

performance at sentencing was substandard in any way.  Moreover,

Mr. Ross' use of Exhibit "1" in an effort to prove Esparza's

---

[19](...continued)
supervising others or selling illicit drugs. [citation
omitted] Nor did he have knowledge or control over the
parcel's contents or the amount of drugs to be sent.
Esparza accepted delivery of the parcel and placed it on a
table inside the house and never had control of the package.
Esparza did not touch or handle the parcel after its
delivery. [citation omitted] He did not sell, market or
distribute the drugs in the parcel.

"minor participant" status, <u>albeit</u> unsuccessful, was hardly
prejudicial to Esparza.  As previously pointed out, the
punishment meted out to Esparza was substantially less onerous
than Ojeda's.

"<u>Allowing Petitioner to be sentenced to the same term,</u>
<u>without arguments under 3553(a) on that part, to the same</u>
<u>sentence as a co-defendant whom had a prior had illegally</u>
<u>reentered the United States, and had a greater relevant conduct</u>
<u>than Petitioner, failing to bring this the court's attention</u>": As
hereinbefore pointed out, Mr. Ross in fact made these arguments
to the Court at sentencing and that in all likelihood explained
why the Court ultimately accorded Esparza more sentencing
leniency than Ojeda.

"<u>Failing to argue the very threshold of what Booker and</u>
<u>Blakely applied [citing to pages 29 - 31 of the sentencing</u>
<u>hearing transcript]</u>": Esparza misunderstands these enumerated
cases, which only apply to enhancements of the maximum
imprisonment sentence, but not to minimum sentences.  In the
cited provisions of the sentencing hearing, there was only a
discussion as to the statutory minimum sentence applicable to
Esparza in this case (that is, 180 months, or 15 years).  In
short, Esparza incorrectly applied Federal law in his 2255
petition, and in any event, Esparza's voluntary plea to the
Information pursuant to the plea agreement (and the factual

28

stipulations contained therein) fully complied with the requirements of these enumerated cases.

"Counsel failed to seek out evidence from bank receipts, and other evidence to demonstrate his claims the money from the bedroom was legal and not from drugs": Presumably, Esparza was referring to the $11,000 in cash which was hidden in his bedroom. Ironically, as proffered to the Court during the sentencing hearing without objection, this money had already by the time of the sentencing hearing been administratively forfeited as drug proceeds, without any claims or objections thereto otherwise being filed. T.P. (5/20/05) at 23-4. Furthermore, the operative words chosen by Esparza in his 2255 petition are important; he artfully stated that "counsel failed to seek out evidence . . .", as opposed to words to the effect of "there was evidence which counsel failed to obtain. . ." This is an important qualification, because there is no indication that Esparza ever reported to Probation during the presentence investigation that he had any bank accounts or the like;[20] consequently, based upon Esparza's own statements, it is highly questionable whether there in fact were any bank receipts or other financial records in existence then or now which would support his bare allegations that the $11,000 was from legitimate sources. Mr. Ross'

---

[20] According to PSR14, "[o]n 6/18/04, the defendant submitted a Personal Financial Statement which indicated he does not have any assets".

29

Declaration is consistent with this conclusion, wherein he stated
in paragraph 29(d) that "Esparza didn't tell me anything about
bank deposits or bank transactions I could use; as far as I knew,
Esparza kept his money in his house, not a bank". In short, Mr.
Ross could hardly be faulted for failing to do something that he
neither knew about nor was likely to even be in existence.

"Counsel never investigated leads of other people in regards
to the letter [presumably attached Exhibit "1"], that had been
given the same type option and accepted the option to take blame,
by Petitioner's co-defendant, and whom was ready to testify to
these matters, where Petitioner told counsel, counsel knew the
person, but nothing was ever done to support the letter being
from the co-defendant": The United States fails to see any
relevance to this supposed investigatory lead, and Esparza has
failed to make any satisfactory explanation in his 2255 petition.
Even assuming for the purposes of argument only that Ojeda had
authored this letter and had actually made similar offers to
other persons to take the blame for him (Ojeda), these assumed
facts involving other persons would not provide a scintilla of
mitigation or extenuation for Esparza.[21] In short, for lack of

---

[21] Mr. Ross' Declaration is also important in this regard,
wherein he stated in paragraph 29(c) that:

   Esparza didn't tell me about 'other names' relevant to the
   [Ojeda] letter; there was no one to subpoena. In any case,
   Esparza's description of the letter as 'maybe that's Ojeda's
                                                  (continued...)

any relevance, there could hardly be any prejudice to Esparza in this regard.

The bottom line is that there was precious little that Mr. Ross could reasonably do under the circumstances to persuade this Court that a sentence approximating the statutory minimum of 180 months was appropriate in this case. There was overwhelming, aggravating evidence of Esparza and Ojeda's co-equal participation in large-scale methamphetamine trafficking and their joint willingness to use deadly force to protect their drug inventory and drug proceeds. The instant case was Esparza and Ojeda's first conviction and consequently, the absence of a criminal history was not a distinguishing feature between them. That Mr. Ross was able to persuasively convince this Court that Esparza's sentence ought to be less than Ojeda's was a significant victory in and of itself.

For the reasons set forth herein, Esparza's 2255 petition should be summarily dismissed.

DATED: Honolulu, Hawaii, November 23, 2007.

EDWARD H. KUBO, JR.
United States Attorney


By /s/ Michael K. Kawahara
MICHAEL K. KAWAHARA
Assistant U.S. Attorney

---

[21](...continued)
style' was not enough to call witnesses to identify the letter as being from Ojeda.

31

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the attached was served via first class U.S. Mail, postage prepaid, on the following:

ERNEST M. ESPARZA
Prisoner #90291-022
1200 Simler Avenue
Big Spring, TX 79720

     Defendant Pro Se

DATED: Honolulu, Hawaii, November 23, 2007.


               /s/ Rowena Kang